Hear ye, hear ye. This Honorable Appellate Court for the Second District is now open. The Honorable Justice Susan F. Hutchinson presiding, along with Justice Anne B. Jorgensen and Justice Mary S. Shostak. The case is number 219-1096, Marmora Real Estate, LLC, Plaintiff-Appellee v. House Toppers Exteriors, Inc., et al., Defendants' Appellants. Arguing for the appellants, David Drenk. Arguing for the appellee, Michael R. Eck. All right, good morning, counsel, and thank you for agreeing to participate in our oral argument in this fashion. We hope soon to be able to see you actually argue, but today we're here. So, Mr. Drenk, if you are ready, you may proceed. Good morning, Justices. David Drenk on behalf of the appellant, as you know. I appreciate the opportunity to participate in this new, tangled technology. Normally, when I've been involved in oral argument out in Elgin, the court often has many questions of me. And the fact that we're on Zoom, I have no problem with being interrupted to field any of your questions. Because I'm here, I'm really here to do that. You've read the briefs, and you know the case. So, it's really, if you have questions, don't feel any problem interrupting me. With that said, I think the briefs in this case was well briefed. But the question on the breach of contract count is an issue relating to damages. And the appellee, Memorial Real Estate LLC, and I may just refer to that as the LLC, has acknowledged that they didn't put in evidence to show your typical measure of damages in a breach of contract case. Which is either the cost of completing a project, or the difference in value that had been done correctly, and what was actually done. So, they've conceded that that evidence is not in the record. What they've argued is they're entitled to reliance damages. And they've cited the Mary Gentlemen v. George and Leona Productions case from the Seventh Circuit. And in that case, the court says that reliance damages are only appropriate for the injured party as an evidentiary disadvantage. And in this case, the plaintiff wasn't at an evidentiary disadvantage. The plaintiff owns the building. The plaintiff had plenty of time to retain experts. It could have actually called the contractor that completed the work as an expert. So, they were not at any evidentiary advantage to apply this reliance damage theory. I'm not even sure. I've never really heard of it before in this case. And I don't practice in federal courts. So, I'm not sure what the Illinois courts feel about this theory of reliance damages. To me, it sounds like restitution. Except you don't place both parties the status quo. And here, the $20,000 that was received by housetoppers was used to purchase about a little less than $19,000 of materials, which it was forced to abandon at the project. So, even here, restitution wouldn't be appropriate because it can't be placed back to the position we would have been in if we were doing restitution. The other difference, and excuse me, I'm very dry. I'm going to take a sip. The other issue is, these apply where the defendant has simply repudiated the contract and walked away from the deal. That's not the case here. My client's subcontractor had his employees up on the roof. My client's principal and owner of housetoppers showed up on the morning the project work started, never went up on the roof, but the subcontractor's employees were up there. Oh, and by the way, the subcontractor was a fully licensed roofing contractor. And his employees are therefore qualified under the act to be doing the work. So, he goes there and they text on him and then he leaves to go to some other projects, never went up on the roof that day. Receives a text and they tell him, this roof is so bad, we can't do the work. And he texts, he contacts the plaintiff, Adib, who happens to be the sole member and manager of Memorial Real Estate, and their meetings were arranged. First meeting doesn't go so well. There's an altercation which is denied. When the second meeting occurs, and my client's told to stop work by Adib's wife, Marianne Tadros, the work is stopped. And after that point, my client tries to work out a written change order which is required under the contract to complete the work, explaining that the entire roof needs to be replaced. No deal is worked out. And, excuse me, I have a real bad tickle in my throat. And my client didn't walk away. He sent the proposed change order and never heard back from them. What they did was they hired a gentleman, Paul Adams, and we introduced him to Johnny Soto, who ended up completing the project with a steel roof. So, the $20,000 that was paid as a deposit, it's undisputed, it was paid, and there's the check in the record. Not by the plaintiff. It was paid by Elk Trail Chiropractic. Now Elk Trail is Marianne Tadros' corporation. She's a chiropractor. The building was bought from a foreclosure sale. It's pretty clear the intent was she planned to move her clinic into the building once they rehabbed it. It needed to be rehabbed and they knew that when they bought it, because the roof was torn apart when they bought it. And so, we don't know, they were going to rehab the building, and they ended up doing that. The $20,000 was paid by Elk Trail, not by the plaintiff. The plaintiff didn't actually incur damages. There's no evidence that the plaintiff repaid Elk Trail, the corporation. There's no evidence there was a promise to repay that to Elk Trail. There's no evidence that Elk Trail, assuming it eventually moved in as a tenant, was ever given a credit towards the rent for $20,000. There's simply no evidence to support that the plaintiff was damaged. The complaint alleges that the plaintiff paid the down payment. That's contradicted by the check in the record, Plaintiff's Exhibit 3. It's against the manifest way to the evidence that there was any contract damages incurred by the plaintiff. There's no evidence that this was even money that Elk Trail gave as a gift, because Elk Trail was going to use the property, so there was no gifts there. There's no damage incurred because my client did not complete the contract once he was asked to cease the work. As far as consumer fraud, I don't think this isolated breach of contract rises to the level of consumer fraud. Assuming it does, again, there's no proximate cause of this $20,000 damages. The work was performed by a licensed contractor, so when the judge found that the consumer fraud was a result of not having a license, and didn't disclose that they didn't have a license, those damage, their $20,000 was not proximately caused by my client's lack of disclosing he didn't have a license because his subcontractor did. There's no duty for a general contractor to disclose who the subs are unless they're seeking payment, then they need to provide a Section 5 affidavit under the Mechanics Lien Act. There was no deceptive act. This was a proximate cause of the damages. In fact, the roof was left exposed because my client was told to stop working. He did not regain access to properly secure the roof. So, again, there's no damages proximately caused, assuming arguendo, that my client was deceptive by not disclosing his lack of license. So, we have no proximate cause of any damages, assuming this consumer fraud act is appropriate. The evidence on the interior damages is good. The judge properly found that they weren't entitled to all these checks for cash, all these receipts, most of which you can't read. The one check that wasn't for cash was for repaving the parking lot. So, none of those damage were allowed and shouldn't have been. Excuse me. The punitive damages, those are only supposed to be imposed where the conduct is willful or outrageous due to an evil motive or reckless indifference. There was no showing that my client's conduct was willful or outrageous or due to an evil motive or reckless indifference. And there were no damages. So, if you don't have punitive damages, I mean actual damage, you can't impose punitive damages. Assuming worst case scenario, punitive damages were recoverable. They were excessive. Mr. Drink? Yes. Your time is up. So, would you please summarize your argument for the court? Sure. The last point I was going to make was assuming punitives were allowable. There's a civil penalty in the Consumer Fraud Act that each violation, $50,000 per violation, and the court should reduce if punitives were allowed to the $50,000. Thank you. Thank you, sir. Justice Jorgensen, do you have any questions? Yeah, I do. You said that the general contractor has no duty to disclose who his subs are, but doesn't he have an obligation to disclose whether or not he's properly licensed? That's an affirmative disclosure? Yes. In other words... I mean, is the plaintiff here to just assume everybody's got the right license? Well, apparently the plaintiff had done some research and discovered before entering into the contract that House Toppers wasn't a licensed contract roofer and could have inquired before entering into the contract, hey, you can't do the work, who's going to do the work? That didn't happen. So there really wasn't a deception to begin with because the plaintiff knew ahead of time that House Toppers wasn't licensed. But I don't think a general contractor, you know, if I'm a general contractor, I'm going to be hiring plumbers, I'm going to be hiring roofers, I'm going to be hiring all kinds of contractors. And I don't think I need to go to the contracting party and say, I'm using this contractor, they have a license, I'm using this contractor, they have an electrician's license, this contractor has a plumbing license. When did the plaintiff know that House was not licensed to do this kind of roof work? The plaintiff sent an email before the contract was signed, indicating, I looked for your license, I can't find it, and asked for his license number. And apparently he didn't remember it and gave her, misinformed her as to a license number. And then if she had already been on the website, the Illinois Department of Regulations, she would have known that that license number was not correct and should have inquired further. But the question was, when did that happen? Oh, that happened, gosh darn it. Approximately? Approximately a week before the contract was signed, or within a month before the contract was signed. Okay. All right, I have no other questions. Thank you, Judge. Thank you, Justice Jorgensen. Justice Shostak. One question, the dollar amount that was, didn't your client initially tell them that the entire roof needed to be done? Yes. And then they didn't want that, so then they went to the partial. Then when the contractor, the subcontractor got on the roof, he said the entire portion needed to be done, right? Correct. He couldn't do the work because it was too wavy for the installation to adhere to the Tecumseh decking. So the $20,000 that was submitted to them, what are you saying that covers for your client? What does that cover? That recovers the Tecumseh decking that was ordered, and the insulation, and the glue, and fasteners, and those totaled about... Did they have a dumpster too? Yes, they also had ordered a dumpster. And what is the status of the company, the plaintiff? The plaintiff? I don't know what the status is. I mean, are they a corporation? What is their status? The plaintiff is, according to their pleading, an Illinois LLC, and Adil Adib, I can't pronounce his entire name, the husband of Mary Ann Tatros, is the sole member and manager of the LLC. That's what he testified to. And no check was given from them? No. The check, Plaintiff's Exhibit 3, for the $20,000, as alleged in the complaint, is in a check drawn on an account of Elk Trail Chiropractic Clinic, not on an account of the plaintiff. Okay. I have no further questions. Thank you, Counsel. Mr. Drank, is there any evidence that Elk Trail Chiropractic Clinic has any interest in Marmora LLC? No, none in the record. Okay. There were other pieces of evidence that were presented to the trial court that allegedly related to damages, but what did the trial court say about those other receipts? He found that those were not sufficient. They were insufficient. I don't think he trusted the receipts. There were all of these cash payments, or checks payable to cash, and those were all cashed. They were all drawn on Elk Trail accounts. They were all cashed by a dib, and then the cash was used to pay these day workers to go in and work on the interior of the building to do the painting and whatnot. In fact, some of the receipts show that there were also credit card receipts, which showed that the money was spent on a Barbie doll and candy bars. The only check in the record that was submitted as evidence of damage that was not payable to cash was payable to a paving company that resurfaced the parking lot. Obviously, that wasn't damage caused by the rooftop contract. Okay. Didn't the trial court find that the failure to get permits and tell the city, as well as the license issue about who was licensed to do commercial, the basis for the fraud finding by the trial court? Well, the damages were not related to those. Those didn't approximately cause any damage. One, the lack of a building permit, those can, as testified by the city official, the village official, he testified that that could still be acquired. My client intended to, and Mac agreed, they would go and acquire that permit, and that wouldn't have caused any damage, except that the project was stopped dead in its tracks at that time. That was the same day that the village inspector was there saying, oh, you guys need a building permit. He didn't shut down the project. My client said, we'll be there later, and we'll get one. So the lack of a building permit wasn't an issue. In fact, the contract itself is silent on whose duty it is to get a building permit, and the municipal code requires it of the owner. So it was actually the owner would have the duty to acquire the permit. It can be acquired by the owner's contractor, but it's not required to be required that the contractor provide the permit. Okay. Why? You were trial counsel, correct? No, no, ma'am. Who was trial counsel? I will have to admit that he's my brother. It was Douglas Drink. Okay. Were you ever there during the course of the trial? No, ma'am. Okay. All right, then I have no further questions at this time. All right, thank you very much. You will have an opportunity to respond after Mr. Eck if you so choose. All right, and Mr. Eck if you are ready, you may proceed. Good morning, and thank you very much. I was at the trial, I was trial counsel, and I know counsel here, Mr. Drink, I think he has spoken about some of the facts and I think it's probably because he wasn't there. But I would like to address those, I will address those as I go through. First of all, to start off in response to counsel, at trial, the plaintiff, we did present evidence for damages, which was our cost to complete the defective or incomplete work of the defendant. Specifically, it's found at our trial exhibit number six, which is at the supplemental record at 38 and 39. And we presented a $74,897.02 as our contract damages. The court found those to be too speculative. So we did put damages in, we did present damages, we weren't asking for the $20,000 as damages. We asked for our damages to be the cost to complete the work, which is the standard, you know, the general rule for damages. And that's how we proceeded. The trial court, in its opinion, determined that those were too speculative and didn't agree with those. Rather, the trial court gave us the $20,000 as damages, essentially saying that, you know, defendants breached the contract and found damages, you know, was the amount that we paid in. This is not a rescission. You know, think about in terms of you pay someone $5,000 to build a patio for you, and they never come and do any of the work, you're out of pocket $5,000. The fact that the amount of damages that the court determines happens to be the same as the deposit doesn't automatically mean that it's rescission. That's an entirely different theory. And then that's very similar to the Yeager case, which has been cited. In Yeager, the court approved damages in favor of the plaintiff equal to the amount that the plaintiff had paid to the defendant. There was also some additional damages on there for some additional work that the plaintiff had to do. But that was the basis of the damages. The married gentleman referred to this as reliance damages, and it's not rescission. So we did put in evidence. The court simply did not agree to our measure of evidence. As far as repudiation, we did not repudiate. And to answer Judge Jorgensen's question, at the beginning, before defendants started work, my client did look up his license. Actually, Dr. Marian Tadros testified that she looked up the license. There was some question as to what his license number was. She looked it up and she found it, and it was a limited license. And she testified at trial that she just assumed that that license allowed him to do that work. So she did her due diligence. The problem is the defendant never disclosed that a limited license only allows him to do residential roofing. It does not allow him to do commercial roofing, which you need an unlimited license for that. And my client and Dr. Tadros did not understand that difference. It wasn't until after this all blew up, when the work ceased, that she found out that he didn't have the proper license. So that's when she found out. That's when the plaintiff found out, after everything went bad. But as far as repudiation goes, my client was told by the defendant that, oh, we have to replace the entire roof. And here's the contract. You have to sign this contract before we do any further work. Well, the trial court properly noted that almost immediately after the defendant started working, that they demanded and told the plaintiff, we have to replace the entire roof. Well, that's not what they contracted for. On top of that, the plaintiff's expert's testimony, which was completely uncontradicted, was that work under the original contract was supposed to only be in the northwest corner. Yet the defendant did work in two other corners. That's where they started. And the defendant never did any work in the northwest corner. So when the judge says that almost immediately after the work started, the defendant said we have to do the whole roof, it appears that the defendant had planned to do this all along. He never intended to do work in the northwest corner. He wanted to get the full roof contract. And what he did to even further that is he cut two large holes in opposite corners of the northwest corner and left, the testimony was there were three by five foot size holes cut clear through to the middle into the building. The expert witness said there is no reason for doing this. You just, if you're replacing the tectum, which is a particular type of roofing, you simply peel that back. You don't need to go after the underlayment. But this is what they did. And on top of that, they did not properly cover the holes. The testimony also of the opinion of the expert witness was that you only remove that which you could repair and replace to make the watertight in one day. You can only replace 10% of the roof in one day. That's all the work you do. Further, he testified that even when he left the job, he was under an obligation to make sure to secure that building to make sure that it was watertight, at least for a temporary basis. All the defendant did was he put tarp on there, which actually cover up the holes and created a hazard. If someone walking up there could have fallen through and been seriously injured. The judge, you know, basically said that, you know, what they did is exploited the plaintiff. Now, was it the plaintiff's obligation to say, okay, we'll mitigate our damages here by saying we'll agree to this fraudulent contract that you're forcing upon us? No, it's not their obligation. And the plaintiff did not repudiate the contract. As far as whose employees were up there, we don't know. They were never identified. We don't know who their names are. They never testified in court. We don't know who they work for, if they were temporary employees or permanent employees. We just don't know. We don't know what they said to other people. So, you know, so the plaintiff did not repudiate it. As far as, you know, the relationship between Elk Trail, the chiropractic business, and Marmora, this is it. Mary Ann Tadros and William Abdel-Malik are husband and wife. Mary Ann Tadros is a chiropractor. She has an elk practice. They testified at court that this is their sole source of family income. He works for the chiropractic company and has authority to sign checks. They bought the building and then transferred title into an LLC. Marmora Real Estate is an Illinois LLC to own the building, and the practice was going to move into the building. Mr. Abdel-Malik is the only member of the LLC. And when he signed the contract to do it, he delivered a check. Mary Ann Tadros and Mr. Abdel-Malik were present when the contract was signed. They were always present when they met with the defendant because Mr. Abdel-Malik has some issues with English. So Mary Ann Tadros was there to be sure the translation went through correctly, but he signed the $20,000 deposit check. This was never an issue at trial. This was never questioned. What defendants seem to be asking is that the plaintiff have to prove the providence of money deposited on the contract. And if that becomes a standard, we're kind of opening up, you know, we're expanding the proofs in a breach of contract. Think about it this way. If they have to testify to prove that somehow Oak Trail money is properly being used for this, that same question would come up in typical construction settings when contractors are paid through construction escrows, which are funded through construction loans. That means in order to prove a breach of contract, we would have to have all these construction escrowees and lenders come in and, you know, say that, oh, this was a proper transaction and that ultimately led to the payment to a contractor. If there's a dispute between Oak Trail and Marmore or any two people where money is owed, that's for another venue and another case. But in this particular case, the representative of the plaintiff signed a check in his capacity as employee for Oak Trail and delivered it to the defendant. That was a deposit. What the defendant is saying is since it was written on an account by another entity, the defendant gets to keep it because it's not really the plaintiff's money. And that's not the issue. That's not part of proofs in a breach of contract situation. That may be something that you want to explore during discovery, but it's certainly not something we want to add to the elements of proof in a breach of contract setting. As far as deceptive practice, and I believe one of the justices brought this up, the trial court did find that the fact that they didn't disclose that Mr. Puchelcy did not disclose that he had a proper license was deceitful. And that he intended for the plaintiff to rely upon this in signing the contract and getting this contract. And once he had this contract, he can go off and do what he did. And that is what the judge said is put the building in a situation where it's vulnerable to the elements and then exploit that to get a bigger contract and to scare the plaintiff into paying more money. And this happened almost immediately after work started. Further, it was shown that, yes. Your time is up. If you would like to finish that thought and then summarize, I would appreciate it. Okay, so the judge found that there were many deceitful acts which came about as a result of the initial deceit of failing to disclose a proper license. To sum up, there was deception here. There is a fraudulent, there is a valid claim for a sound judgment for violations of the Consumer Fraud Act. Punitive damages were justified and the $20,000 is proper damages as awarded by the court. And I'd ask that the court affirm the trial court's judgment. Thank you. Thank you very much, Mr. Eck. Justice Jorgensen, do you have any questions? I have basically just one question. I'm troubled by the sequence of events here. In that the defendant here looks at this roof and says, you know, your whole roof needs to be replaced. They apparently renegotiate. He's just going to repair a part of it. But then his subcontractor gets up there and says, you know, what we're supposed to do here isn't going to work. It's not going to stick. It's not going to accomplish the desired end of the contract, which is to fix the roof. So what other alternative did the defendant have? Well, that was testified to and that's a good question because that was actually brought up during the expert's testimony. Which expert? Mr. Snowden. Mr. Snowden was the only expert witness at trial on behalf of the plaintiff. So at trial, the testimony came out that Mr. Puchowski, who does not have the proper license, was the only one who went up on the roof prior to the work beginning. Also, he first came in and said, we could do this, this and this. And the plaintiffs came back and said, we want to make sure it's well done. And he actually came back with another proposal, which was a little bit more, doing a little bit more work and doing a little bit more work. And they finally agreed on the contract and that was signed. So there was never a prior agreement that they needed the whole work done. Substantially more. I shouldn't have used the word whole, but substantially more work than was done. Right? No, I believe that before the original contract was done, any prior contracts were of a lesser amount dollar-wise. You know, the only contract amount that was ever provided to the plaintiff that was greater than the initial contract was the one that came after work had already started. Now, the testimony of the expert was that you can go up there and you don't need to cut open the roof to determine if the whole roof needs to be replaced. You can either test by walking on it. Now, the subcontractor was never up on there before the work began. Only Mr. Puchowski was. And the expert further stated that if you can't tell that way, then you hire an engineer who comes out and does a quick stress test. You do not cut into the roof because if you cut into the roof, you've compromised the integrity. The first thing that the defendant did when he got up on the roof is he started cutting the roof. And at that point, there's no turning back. Then after he cuts the roof and irreparably damages it, and it has to be replaced regardless of what its condition is, then he comes to the plaintiff and says, oh, now you need a whole roof. So he's kind of laid it out where he's given my client no alternative. And there was no testimony. Well, what I'm confused about, wasn't there an early contract of a bid for replacing the Teckum decking on the entire roof for some $80,000? And that bid was rejected, and then they came to an agreement of substantially less square footage for a little over half that price? No, I don't believe that. There was an initial contract of about $24,000 that was never signed. Then there was an ultimate contract, and I forget what the amount was, of whatever was actually signed. The $79,000 or $80,000 contract was the one that came after the fact. Okay, there was never a bid prior to that. That's your position? Not from this defendant, no. Okay. Like I said, there was only initial contracts to do some repair work. That's when the plaintiff went back to this defendant and said, no, we don't want just to repair it. Let's do some other stuff to make sure that it's good. That's when he did another proposal that actually increased the price, and then they signed that. That's what they signed it. No point prior to that did he ever present a proposal that says you have to replace this. The first time that this defendant ever notified the plaintiff that the entire roof had to be replaced was after he already cut the holes in the roof and damaged a substantial portion of the roof. Again, an unnecessary act by industry standards. Okay. Do you have any evidence that there was any agreement between Plaintiff Heer and Elk Trail for repayment of that $20,000? No, there wasn't. I don't believe it was. Yes or no? No, there was no agreement. The relationship between Elk Trail and... Counsel, hold on a second. For some reason, you started to break up, so could you start over with your answer? There was no agreement. At trial, when testimony started to come out from Dr. Tadros, it's the relationship between Elk Trail and Marmore Real Estate that was objected to by defendant as irrelevant. And the judge did allow one question, and then it ceased after that. But the testimony was clear that Elk Trail was going to be moving in there and paying rent and expenses and things like that. So, certainly, Elk Trail would have no cause of action against the defendant for the payment made. There's no contract relationship there. If there was amounts owed to Elk Trail, that would be between Elk Trail and Marmore. But again, as was testified at trial, Elk Trail and Marmore consist of two people, and that's the husband and wife. And that's the relationship, and Elk Trail was her only source of family income, and that's why this is all being paid directly from Elk Trail, which was, again, intended to be the substantial tenant in the building. Okay. I have nothing else. Thank you. Thank you. Justice Shostak, do you have any questions? Yes, briefly. Did your client then, after he reached out and said, oh, the whole roof has to be done, did your client then call and say, no, cease all the work? I'm sorry, I didn't catch the last part. Did they call and say, cease the work? Complete the work? Cease. Stop. No, they never said that. What happened is, when Mr. Puchowski went to the plaintiff and said, you need to replace this work, the testimony was that he was going to do an updated contract and send it to him. It wasn't a change order, it was a new contract. And the next day, he did, in fact, send a new contract, which he demanded be signed before work resumed. And it also included some other provisions in the contract, and then that contract was followed by an email that said, hey, look, rain's forecast, you better sign this, which the judge saw as a scare tactic. But at that point is when the plaintiff started looking in deeper and discovered that Mr. Puchowski didn't have the proper license to do this, and then they became suspicious and they felt that they were the subject of a fraud. So at that point, they refused to sign the new contract. Did they terminate the old one? No, actually, there was no termination. In fact, I think there was no termination. There was no bright line that said the old contract is dead. The defendant refused to continue work under the first contract and would only come back to the property if they signed the new contract. Now, the defendant during the meeting said, I will send you a new contract that you'll have to sign before we go back up on the roof, and that was at the meeting. Now, I asked your opponent, what is the status of Marmora? What is Marmora's status? How are they a party in this litigation? Okay. Marian Tadros and Mr. Abdel-Malik purchased the building. They then transferred title into Marmora Real Estate LLC, which Mr. Abdel-Malik is the sole member and manager, sole member. Dr. Tadros manages it. Okay. She does the day-to-day work. He's the owner of the LLC. He's the member owner of the LLC. I hope that answers your question. Yeah, that does. Thank you very much. What is the statute of limitations on fraud? Was this fraud action brought within a three-year period? I guess I answered the first question. Yeah, initially, and this is kind of an odd, you know, the case has an odd history. It was initially filed by the defendant as a breach of contract against Marian Tadros personally. That was in small claims. She appeared and answered, and then Marmora Real Estate filed a third-party action in that small claims case against the defendant, and then that resulted in the case being transferred up to the law division. Okay. And now that was in the 2013 case. So the case was filed in 2013 and continued on. Then when Dr. Tadros was awarded summary judgment, that just left Marmora as the only complaining party. But Judge French said that she couldn't find the order in the file of the small claims case allowing Marmora leave to appear in the case. And because of that, she felt that she didn't have proper jurisdiction of the case. And then she dismissed the case without prejudice to Marmora's rights to refile, which was done within a couple weeks later. So it has a history going back to 2013. So you submit that at the time the initial action was brought, it was within the statute? Yes, it was all within the statute. And that was never raised? Right. That was not raised in the trial court? Correct. Correct. Now, in order to have punitive damages, you have to have actual damages, correct? Correct. And in order to have attorney's fees, you have to have a violation of the Consumer Fraud Act, correct? I believe that's correct, yes. What work did the new contractor do? Did they do the entire roof? They, I think at that point, the entire roof had to be replaced because of all the damage that was done by the defendant. What he did is he brought a saw, this large saw that cuts lines up and down the roof that leads to the removal of the roof. He cut all these lines, and once you cut the roof, regardless of whether it was in perfect condition or needed replacement, it had to be replaced. So any subsequent contractor that came down to the site said, no, we got to replace the entire roof. We don't care if the tectum was okay, it has to be replaced. So whether the roof was originally in good condition or not was moot. The cutting by the defendant made it a moot point. I have no further questions. Thank you, Justice Shostak. Mr. Eck, are you saying that somehow that small claims case told the statute of limitations on this 17L347 case? Well, it did because Marmora did appear in the small claims case as a third party defendant and filed an action against Puchowski and Housetoppers in that action back in 2013, and that remained ongoing when it was transferred up into the law division. So Marmora did take action. The only reason that that case was dismissed is because the order allowing Marmora to appear can't be located within the file. And both at the trial level, Doug drank, counsel here's brother, and I both acknowledged to Judge French that yes, Marmora was granted leave, but Judge French simply, she wasn't the judge at the time and no one can seem to find the order allowing Marmora to appear. So she felt that the record was insufficient to show that she had proper jurisdiction. So that's why she needed to dismiss it and then of course it was refiled. You know, we did maintain an action. It's kind of, it's tantamount to a plaintiff maybe taking a non-suit at some point and then refiling within the one year or within the remaining statute of limitations, whichever is longer. And you didn't refile within one year, if we're going to use that analysis, correct? No, we refiled within a couple of weeks. No, it's 2017. It's not 2013 or 2014. No, the case was filed in 2013. I know that. Yes. I understand. I'm sorry. I'm sorry. Summary judgment and dismissal of the 2013 case occurred in 2017. Okay. You indicated an argument that Dr. Tadros was your client. Where in the complaint is she alleged to be your client? I'm sorry, Judge, I refer to that informally and I don't use that. Marmora Real Estate in this case is my client. Correct. And what interest does Elk Trail have in Marmora? Technical interest, it doesn't. They simply share. There's an overlap of owners with William Abdel-Malik being the member of the LLC and Elk Trail, which is a corporation, I believe. And he's a member of that corporation. So there's an overlap there. Well, he may be a member of Elk Trail, but is Dr. Tadros in any way a member of Marmora? No, as she testified to court, she's essentially the manager of the LLC. But that doesn't give her an ownership interest, correct? No, it doesn't. It doesn't give her a membership interest, correct. So how, in this case, was Marmora injured if Marmora never paid anything to housetoppers, or for that matter, as the judge indicated, maybe to the subsequent contractors? Well, in this case, Marmora was under an obligation to provide office space to Elk Trail. And Elk Trail was, I mean, even though it wasn't, you know, brought out in testimony, you know, the proffer would have been that Elk Trail is bearing the cost of improvement and will occupy and rent. And, you know, much like any business tenant would pay for build out and, you know, have a space for them. That's what Elk Trail was doing. So Elk Trail, you know, advances these funds and never, you know, receives the benefit of their bargain. Certainly, they don't have any action against housetoppers or Pucholsky directly, that actually would be against Marmora. But then again, that's, you know, any dispute between Marmora and Elk Trail wouldn't be proper within this, you know, claim between Marmora and the defendant. So, you know, it's much like, you know, if any company went out and borrowed money to do construction, it may not be their money because they're borrowing it or it's being advanced on their behalf, but it's still, you know, an obligation that the defendant has to do work. The defendant has these funds and it would be unjustly, the defendant would be unjustly enriched if they're allowed to keep the $20,000. You know, so, you know, I don't think we, I think it's, I think it would be dangerous to require that every plaintiff prove the providence of their funds when making deposits on contracts. I think that opens up the door to, you know, expanding what proofs are being required in a breach of contract in this case. Well, who has the burden of proof in this case? Well, the plaintiff has the burden of proof and the plaintiff's, you know, testimony is this was the deposit and this was the deposit made by the plaintiff, delivered to the plaintiff defendant by Mr. Abdel-Malik, who, by the way, is also the one who signed the check on behalf of Elk Trail. Dr. Tadros was there and they delivered the check and signed the contract all at once. So that's what, that was proven, that was never disputed. So. Did Mr. Abdel-Malik, when he signed, when the contract was signed with Housetoppers, did he sign it with his name or did he sign it as president or representative of Marmora? He signed it. I don't, I don't recall. Well, if he only signed, let's assume that he assigned it with his own name. How is Marmora even interested in that contract? I'd have, I'd have to look at the contract, Your Honor. I believe, I believe it was Marmora, but I, again, I can't picture the contract in front of me. If you could take, if I could have just a quick moment to see if I can. Okay. Well, I've got it right in front of me and it just has his name. It doesn't indicate anything else. Nor, I don't believe Marmora is even mentioned on this contract. But it was, he did testify that he's the, the manager of the building and the building's owned by Marmora. So he was testifying that he was signing it as, you know, membership capacity. That's an interesting issue. What in the record, other than your client, other than Mr. and I, I'm sorry, I cannot pronounce his last name. Abdelmalek. Okay. Other than that testimony indicates that this property is even owned by Marmora. Well, there was testimony, but there was never, you know, we didn't, we didn't bring in a, a canceled recorded deed or anything like that. But that was a, that was a testimony and that went in without objection and unchallenged. And certainly if, if the defendant would have said, you know, we don't believe that, that that's the case, then they certainly could have brought that up. But I think that was also addressed in discovery. They did deny it in the pleadings, didn't they? I don't recall what the answer was, but in discovery, there was, there was a lot of discovery issued or exchanged. I believe that the deed into Marmora was actually presented in discovery. So. In fact, the answer says neither admit nor deny strict proof demanded. Yeah. I mean, that's, I think that's, that's, that was something that was done throughout the answer. That appears to be just on that one in particular at the beginning anyway. All right, let's one last question. You said that the defendant never intended to do the contracted work because in fact what he did was start on another part of the roof and not the part that is allegedly under this contract. And that is the first deception. Did the trial court make a finding that that was the deception in fact? No, the trial court made the finding that the initial deception was, was the failure to disclose that he wasn't properly licensed. The judge, the judge did list out a number of deceptions that occurred thereafter in the judgment. And. And that, but, but that the deception on the Deception on the Where they started the work, did they, did he Sorry, say that again. The trial judge never mentioned where the work was started. No, no, it never judge never did mention it. I think Thank you, counsel. Okay. All right. Now, Mr. Drake, if you're feeling the tickle is gone and you have any response, please go forward. Thank you, Judge. A couple of things. I wasn't at the trial. I'm handicapped, just as your honors are all I had before me when I prepared the brief was the transcripts from the trial. And also the exhibits and the pleadings. Clearly in the pleadings, the defendants denied paragraph 22 of the complaint, which alleged that plaintiff paid the deposit plants on exhibit number three is an elk trail chiropractic clinic check. That allegation was denied. They failed to prove it was their burden of proof. And a question was posed wasn't there originally a bid for the full amount of the contract representations were were wholly erroneous that there wasn't I will draw your attention to plaintiffs own exhibit for I'm sorry. I think it's exhibit to Yeah, if you compare exhibit two and four, you'll see that originally The original bid was for the 80 $80,990 and that's what went when My client discovered because he's not an expert on tech I'm decking. But when Max employees went up there and discovered that it was too wavy only then did my client. Say wait a minute, we got a problem. Only then did Todd rose, according to the trial testimony say that the work And only then did my client stop the work wasn't allowed to go back on and complete the job. And now we've got the well you know the cost to complete the work. There was an exhibits for the entire thing. It was some 70 or 80,000 The entire roof needed to be replaced, period. They wanted to skimp and just do it partially when they when my client was advised by qualified licensed Workers that it could not be just etched and he relayed that to the plaintiff. They ended up replacing the entire metal deck, which is what they could have done in the first place. That contract the plans for that entire metal deck are in one of plaintiff's exhibits. I don't have the number in front of me. Now, Council makes light of this relationship, their husband and wife and let's disregard the corporate and LLC structures and If they didn't want to have those structures, they shouldn't have used those they should have held the property jointly as they originally purchased it at the foreclosure sale. As far as repayment. There's no testimony that elk trail when it moved into the building or they added. I don't even know if it did, but assuming it did. And that was in the record. There's nothing indicating that Marmora gave a rent concession and incurred damages to the tune of the $20,000 by virtue of a rent concession. We're asked, we're asked here to just ignore the corporate and LLC structures.  This testimony of the expert. The contract called the one that was signed called for 1700 square feet of the 5000 square feet, and it doesn't identify which 1700 square feet. So there's no way that expert could have discerned which of portions of the roof or to be replaced. And finally, with respect to replacing opening up a roof and then closing it up only doing what you can on one day, they couldn't even go back on the roof. The next day, the police are called. We're never left. The materials were left on site that couldn't even retrieve those my client spent a 18,000 some odd dollars out of the 20,000 for for those materials, not only is it not only rescission, but reliance damages are not appropriate either. They had, they were not disadvantaged as to presenting evidence, and my client didn't just run away from the project, he was closed down. So, there's no, no proof of actual damage. There's no proof of consumer fraud and assuming worst case scenario, there should be no punitive damages in excess of $50,000. I ask your honors to reverse and remand or reverse outright, or alternatively, remand for a remitted or of the punitive damages. Thank you, Mr. Justice Jorgensen any questions of Mr. I have no additional questions. Thank you. Justice Shostak any questions of Mr. Mom, thanks. One question. The issue with respect to Memorial, not being a party, when did you ever raise this at what point. More on that being a part of my moral is the party is a plaintiff. Right. And I mean I thought I heard you indicate some questions as to what their role is here I was wondering when you raised that for the first time, or did you just start arguing that today. No, no, no. It was raised in the pleadings where the complaint alleges quote plaintiff paid. And that allegation was denied paragraph 22 of the complaint is denied. That's a factual issue. And the only evidence was, was a check paid by trail. Okay, thank you. All right, Mr drink I don't have any other questions at this time. Gentlemen, thank you for your argument this morning and thank you for waiting for us while we got got you up and running. We will take this matter under advisement, we will issue a decision in due course, and Mr Kaplan we will now leave this meeting and take about five minutes to let you get the new meeting established, and we will see you then. Thank you. Thank you.